Filed 10/31/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| EVA OSBORNE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PLEASANTON AUTOMOTIVE COMPANY, LP, et al.,<br><br>    Defendants;<br><br>BOB SLAP,<br><br>    Defendant and Appellant. | A167118<br><br>(Alameda County<br>Super. Ct. No. RG20058903) |

In March 2020, Plaintiff Eva Osborne sued Defendants Pleasanton Automotive Company, LOP Automotive Company LP, HAG Automotive Investments LP (collectively, HAG), and its Executive General Manager and Market Area Vice President, Bob Slap. The suit asserted eight causes of action for discrimination, retaliation, harassment, failure to prevent harassment and retaliation and wage and hour violations arising from alleged workplace misconduct by Slap during four years when Osborne was working as Slap's executive assistant.

Two-plus years into the litigation, Slap filed a cross-complaint against Osborne, alleging statements in a letter she submitted to HAG's human resources director three months before she filed suit constituted libel, slander, intentional infliction of emotional distress, intentional interference

with contractual relations and negligence. In response, Osborne filed a special motion to strike (the motion) under the anti-SLAPP law (Code Civ. Proc., § 425.16),[1] contending Slap's claims against her arose out of protected activity she undertook in anticipation of litigation. She asserted Slap could not show he would likely prevail on the merits because, among other reasons, her statements were absolutely privileged by Civil Code section 47, subdivision (2).

In a thorough, well-reasoned opinion, Alameda Superior Court Judge Eumi Lee granted Osborne's motion, concluding her statements were protected activity under the anti-SLAPP statute and rejecting Slap's arguments that they were extortionate and illegal as a matter of law. The court held Slap could not establish minimal merit in his claims, as required to withstand an anti-SLAPP challenge, because Osborne's statements were both absolutely and conditionally privileged under Civil Code section 47 and Slap failed to overcome the conditional privilege with a showing of malice. Slap appealed.

Applying de novo review, we likewise reject Slap's attempt to invoke an exception to the anti-SLAPP statute for activity that is illegal as a matter of law and conclude the litigation privilege bars Slap's claims, preventing him from meeting his burden under the second step of the anti-SLAPP analysis to show his claims have minimal merit. We therefore affirm the trial court's decision granting Osborne's motion. We need not reach Osborne's alternative arguments that the conditional privilege applies, that Slap has failed to show malice or that Slap has failed to make a prima facie showing on his claims.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

# BACKGROUND

We take the following facts from the pleadings and the parties' evidence on the special motion to strike.

## I.

### *The Human Resources Letter and the Underlying Litigation*

HAG employed Slap in 1993 and promoted him several times over the years. Slap was serving as HAG's Market Area Vice President in 2015, when HAG hired Osborne to serve as his executive assistant. HAG paid Osborne on an hourly basis.

It is uncontested that, in addition to her professional duties, Slap had Osborne perform personal errands and tasks for him. Slap alleged these personal tasks were part of her job duties, which HAG authorized because they "allowed Slap to focus on his duties as Market Area Vice President." Osborne alleged Slap "required her to perform demeaning personal tasks such as carry his bags, launder his gym clothes, shine his shoes, cut up his food [and] get up from her desk and come into his office for the purpose of refilling his water glass" and she was "routinely not paid for all hours worked and required to work overtime for which she received no overtime compensation."

Osborne alleged she had repeatedly complained to HAG's controller and Human Resources (HR) director, Nancy Cassity, about these matters, leading Slap to retaliate against her and that HAG took no action to investigate or remediate Slap's conduct. In 2019, Osborne again complained to Cassity that she was not being properly compensated for personal tasks that Slap asked her to perform. Cassity instructed her to log all her time—for both business-related tasks and the personal errands Slap required her to perform—and to file any workplace-related complaints in writing.

3

According to Slap, around that same time Osborne "essentially blackmailed" him by threatening to report his misuse of her time and function unless he made her a salaried employee. Slap, in turn, reported this alleged incident to Cassity.

On December 20, 2019, Osborne emailed Cassity a four-page, single spaced letter (the HR letter), which she referred to as a "Formal Complaint," documenting Slap's alleged misconduct. In it, she stated that Cassity had recently directed her to put her concerns in writing before any action could be taken or her concerns could be addressed, and, accordingly, she was "sending you this letter in a final effort to have my concerns acknowledged, addressed and resolved." We describe the letter more fully below in the analysis section of this opinion. In brief, the letter described at length instances of Slap's alleged misconduct, accused him of repeatedly making inappropriate and demeaning requests of her, stated he refused to allow her to log all of her time and repeatedly failed to ensure she was paid for all the work he asked her to do, stated she had discussed Slap's behavior with Cassity "on numerous occasions" hoping Slap's behavior would improve, stated he had retaliated against her when she complained and said she "now" found her working conditions "unbearable and intolerable." At around the same time, she contacted and retained counsel, who the following month sent an email to HAG's counsel inquiring about the state of the investigation HAG had told Osborne it would undertake, demanding documents and giving notice of the obligation to preserve evidence.

4

In March 2020, three months after sending the HR letter,[2] Osborne sued Defendants. She asserted claims solely against HAG for discrimination; retaliation; failure to prevent harassment, discrimination, and retaliation; and failure to pay wages and overtime. She asserted a claim for hostile work environment harassment based on sex against all Defendants, including Slap. Among other facts, the complaint alleged, "[i]n 2017 when Plaintiff complained to Slap that a coworker was sexually harassing her, including touching her inappropriately, Slap refused to investigate or take remedial action to address her concerns. Slap then promoted the coworker to Parts Manager and, in a subsequent lawsuit filed by the coworker, ordered Plaintiff to lie under oath." It also alleged that Slap "repeatedly expressed that . . . he hated all women."

In August 2022, Slap filed his cross-complaint, contending twenty-five statements in the HR letter, as well as one oral statement Osborne made to Cassity, were false. Based on the allegedly false statements, he asserted claims against Osborne for libel, slander per se, intentional infliction of emotional distress, intentional interference with contractual relations, and negligence. Those allegedly false statements include:

(1)     that Slap told Osborne he hated all women;[3]

(2)     that Osborne had complained to Slap that a coworker was sexually harassing her;

---

[2] Osborne filed the suit on March 16, 2020, shortly after having filed a complaint and received a right to sue letter from the Department of Fair Employment and Housing (DFEH).

[3] The HR letter does not contain this statement, but Osborne allegedly said this to Cassity in a December 2019 meeting.

5

(3)     that Slap forced Osborne to carry multi-gallon water containers, while she was eight-months pregnant, over her objections and against her doctor's orders;

(4)     that Slap demanded Osborne put his personal purchases on her credit card;

(5)     that Slap pressured Osborne to loan him money;

(6)     that Slap demanded that Osborne slice his food;

(7)     that Slap slammed his water cup on Osborne's desk in response to her request to pick up her sick child from school, and then demanded that she re-fill his cup before she left;

(8)     that Slap forced her to accompany him into a hospital room, while he was clothed in just a hospital gown, and while he answered "personal questions" from medical professionals;

(9)     that Slap forced Osborne to take delivery of his new dog while he was out of town;

(10)    that Slap asked Osborne to clean up his dog's excrement;

(11)    that Slap attempted to conspire against HAG to provide Osborne with a de facto, off-the-books pay increase;

(12)    that Slap denied her a salary;

(13)    that Slap did not allow Osborne to log her hours for the time she spent performing personal errands for him;

(14)    that Slap instructed her not to contact HR when it would have been appropriate to do so; and

(15)    that Slap had Osborne doing only personal work for him over the four prior years of her employment.

## II.

### *The Anti-SLAPP Motion and Briefing*

Osborne filed a special motion to strike Slap's cross-complaint. She argued the "[p]relitigation statements" she made in the HR letter that gave rise to Slap's claims against her were protected activity because they were made in connection with potential litigation that was contemplated in good faith and constituted protected activity under section 425.16, subdivision (e)(1) and (e)(2). Further, she argued that because the statements were made in connection with potential litigation, they were protected by the litigation privilege established by Civil Code section 47, subdivision (b). As evidence that the December 19, 2019 HR letter was sent in anticipation of litigation, she provided a declaration stating that she had been contemplating litigation in the days leading up to December 19, 2019, and that she had retained a law firm on December 27, 2019, and attached a copy of a December 20, 2019 email sent to her by that law firm conveying a retainer agreement and requesting a retainer.

Osborne also asserted that Civil Code section 47, subdivision (c) conditionally privileges the HR letter, subject to a finding of malice, because it was a workplace harassment complaint and asserted that Slap had proffered no evidence demonstrating malice in the form of "ill will going beyond that which the occasion . . . justifies." In addition, Osborne asserted Slap could not meet his burden of prevailing on the merits because he could not overcome either asserted privilege and because he failed to adduce prima facie evidence supporting one or more elements necessary to each of his claims.

In his opposition, Slap attacked Osborne's assertions of privilege. He argued the absolute litigation privilege did not apply because no party

7

anticipated litigation in December 2019. He then challenged Osborne's definition of "malice" for purposes of the conditional privilege, contending he demonstrated malice through evidence that Osborne knew her statements to Cassity were false and evidence that she engaged in what he referred to as "attempted blackmail." He also claimed to have proffered prima facie evidence in support of each element of his claims.

In her reply brief, Osborne curiously suggested she "made no such claim" that the HR letter is absolutely privileged and focused on the conditional privilege and Slap's asserted failure to show malice as well as on the legal insufficiency and inadequacy of the prima facie showing supporting, Slap's claims.

The trial court issued a tentative opinion granting the motion, but at the hearing Slap disputed having conceded the HR letter was protected activity, and for the first time argued, citing *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*), that the HR letter's statements cannot be protected because they constitute extortion or blackmail. Slap's counsel also requested the opportunity to submit supplemental evidence and briefing to address the absolute litigation privilege, claiming that "the sole basis of [Osborne's] motion was based upon not absolute privilege, but conditional privilege." Osborne's counsel argued that her opening brief had argued absolute privilege based on her having written the letter while in good faith contemplating litigation, and the reply brief suggestion "we were withdrawing the absolute privilege argument" reflected a miscommunication and Osborne was *not* withdrawing her claim that the HR letter fell within the absolute litigation privilege.

At the conclusion of the hearing, the court granted counsel's "request for a short additional brief" on whether the HR letter was absolutely privileged and allowed the parties to submit additional evidence.

Both parties submitted supplemental briefing and evidence. Slap's supplemental briefing argued Osborne had "extorted" Slap and " '[e]xtortion is not a constitutionally protected form of speech' under Anti-SLAPP statutes." Osborne's countered that the *Flatley* exception to assertedly protected speech only applies where the party admits, or the evidence " 'conclusively establishes' " the speech was illegal.

After receiving the supplemental briefing and evidence, the trial court took the matter under submission and issued a final order granting Osborne's motion to strike. The court again found that "Slap appear[ed] to concede that the HR letter constitutes protected speech." However, the court also addressed and rejected Slap's argument that "the HR letter was not privileged because it constituted extortion, which is not protected speech." The *Flatley* exemption did not apply "because Osborne has not conceded the underlying activity is illegal, nor does the evidence (the HR letter itself) reflect that the HR letter was an attempt at extorting Slap before filing suit." The court further concluded that Osborne's evidence, including her own declaration stating she had been contemplating litigation, the December 2019 email from a law firm attaching a proposed engagement agreement with attorney Tyler Paetkau and the fact that Osborne in fact promptly sued HAG and Slap for harassment and other claims, established that Osborne sent the HR letter in anticipation of a lawsuit. Based on that, the court held the HR letter was "protected activity" and met the requirements for the absolute litigation privilege. The court also held, in the alternative, that the qualified privilege for communications with interested parties applied and Slap's

9

proffered evidence was insufficient to "establish[] malice for purposes of overcoming [the] qualified litigation privilege." "[B]ecause Slap ha[d] not overcome the litigation privilege defense," the court held he had "fail[ed] to establish a probability of prevailing on the merits of his cross-claims." The court did not reach the arguments about the sufficiency of Slap's cross-claims.

Slap timely appealed.

## DISCUSSION

### I.

### *Legal Standards*

The purpose of the anti-SLAPP statute is to " 'prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." ' " (*Flatley*, *supra*, 39 Cal.4th at p. 316.) It accomplishes this by authorizing a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) We review the trial court's decision to grant an anti-SLAPP motion de novo. (*Flatley*, at pp. 325-326.)

" 'A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e).[4] If the court finds that such a showing has been made, it

---

[4] Osborne contended her letter to HR, on which Slap's claims were based, fell within section 425.16, subdivision (e)(1) ["statement or writing

10

must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Central Valley Hospitalists v. Dignity Health* (2018) 19 Cal.App.5th 203, 216 (*CVH*).)

"As the Supreme Court earlier instructed, at this first step of the anti-SLAPP analysis, 'the moving defendant bears the burden of identifying all *allegations* of protected activity, and the claims for relief supported by them.' (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, italics added.)  Or, as we said in another SLAPP case—there, in affirming an order granting an anti-SLAPP motion—'[t]he question is what is pled—not what is proven.' (*Comstock*[, *supra*,] 212 Cal.App.4th [at p.] 942.)"  (*CVH, supra,* 19 Cal.App.5th at p. 217.)

Once the defendant has met its burden of identifying allegations of protected activity and the claims for relief supported by them, the burden shifts to the plaintiff to demonstrate its claims have "have at least 'minimal merit.' "  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061.)  While that burden "may not be 'high,' he must demonstrate that his claim[s] are legally sufficient" and that they are "supported by a sufficient prima facie showing . . . made with 'competent and admissible evidence.' "  (*Comstock, supra,* 212 Cal.App.4th at p. 948.)  In determining whether the plaintiff has met this burden, we "consider the pleadings, and supporting and opposing affidavits stating the facts upon

---

made before a legislative, executive, or judicial proceeding"] and subdivision (e)(2) ["statement or writing made in connection with an issue under consideration or review by a legislative, executive or judicial body"] because she was contemplating litigation when she prepared the letter and sent the letter in part to cut off an "avoidable consequences" defense to a potential suit against her employer.  (Citing *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 934-935, 944 (*Comstock*).)

11

which the liability or defense is based" (§ 425.16, subd. (b)(2)), and " ' "accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." ' " (*Comstock,* at p. 947.)

We review a ruling on an anti-SLAPP motion de novo, " 'engaging in the same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step.' " (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822 (*Anapol*).)

Besides the anti-SLAPP statute, this case involves the litigation privilege embodied in Civil Code section 47, subdivision (b). The anti-SLAPP statute is a procedural device to screen out meritless claims based on certain speech and petitioning activity. However, the litigation privilege is a substantive law that provides an absolute defense to tort liability for certain kinds of speech. Although the litigation privilege sometimes bears on the analysis of the first (protected activity)[5] or second (minimal merit)[6] steps of the anti-SLAPP analysis, the anti-SLAPP statute and the litigation privilege

---

[5] "There is, of course, a relationship between the litigation privilege and the anti-SLAPP statute. Past decisions of this court and the Court of Appeal have looked to the litigation privilege as an aid in construing the scope of [section 425.16,] subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry—that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivision[] (e)(1) and (2)." (*Flatley*, *supra*, 39 Cal.4th at pp. 322-323.)

[6] " 'In the anti-SLAPP context, the litigation privilege presents "a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing." (*Flatley v. Mauro*[, *supra*,] 39 Cal.4th [at p.] 323.)' " (*Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757, 786 (*Crossroads*).)

12

are not coextensive. (See *Crossroads, supra,* 13 Cal.App.5th at pp. 786-787, 788.) Civil Code section 47 codifies common law privileges that operate as defenses against liability. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 737.) These privileges generally immunize a defendant from torts arising from communicative acts to which the privileges apply. (*Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518-519.)

The litigation privilege " 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).) A prelitigation communication may be privileged but "only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment,* at p. 1251; Civ. Code, § 47, subd. (b).) The litigation privilege "is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' " (*Action Apartment,* at p. 1241.) " 'Any doubt as to whether the privilege applies is resolved in favor of applying it.' " (*Crossroads*, *supra*, 13 Cal.App.5th at p. 786.) "If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913.)

Civil Code section 47, subdivision (c) codifies the privilege for certain communications made "to a person interested therein." The interested party privilege been applied to statements made in workplace complaints and investigations. (See, e.g., *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538; *Comstock*, *supra*, 212 Cal.App.4th at p. 953.) Unlike the litigation privilege, the interested party privilege is conditional rather than absolute; only "a finding of malice will prevent the communication from being found privileged." (*Cruey v. Gannett Co.* (1998)

13

64 Cal.App.4th 356, 367; Civ. Code, § 47, subd. (c).) "Malice" in this context may be " ' "established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights . . . ." ' " (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1121.)

## II.

### *The Statements on Which Slap Bases His Cross-Claims Are Protected Activity Under Section 425.16, Subdivision (e)(1) and (2), and the* Flatley *Exception Does Not Apply.*

We begin with the threshold inquiry into whether the acts underlying Slap's cross-claims arise from the furtherance of protected activity as defined by the anti-SLAPP law. Slap's cross-complaint contains a list of what it alleges are "false" and "defamatory" statements Osborne made in a December 2019 letter to HAG's HR department. Each of the five tort claims that follow—libel, slander per se, intentional interference with contractual relationships, intentional infliction of emotional distress and negligence—incorporates these alleged statements and relies on them as the primary basis of the claim. Slap alleges Osborne made the statements to HR with certain intent and knowledge and that her statements were unprivileged and malicious, but the only acts alleged in support of the cross-claims consist of Osborne's statements in the HR letter. Neither privilege nor malice directly bears on step one of the anti-SLAPP analysis, which asks simply whether the plaintiff's cause of action fits one of the categories set forth in subdivision (e) of section 425.16. (*Navallier v. Sletten* (2002) 29 Cal.4th 82, 88; see *id.* at p. 92 [rejecting argument that illegitimacy of defendant's acts must be addressed at first step of anti-SLAPP analysis]; *Crossroads*, *supra*, 13 Cal.App.5th at p. 787 [conduct protected by Civ. Code, § 47 does not

14

automatically satisfy "in connection with" requirement under subdivision (e)(2) of anti-SLAPP statute].) Slap does not deny that his cross-claims are all based on statements made by Osborne in the December 2019 HR letter. Nor does he contest Osborne's argument that the statements in the HR letter are prelitigation statements that generally fall within subdivision (e)(1) and (e)(2) of the anti-SLAPP statute that identify protected activity.

Slap's sole argument that the challenged statements are not protected activity under the anti-SLAPP statute is that they were made in furtherance of an attempted extortion and thus criminal as a matter of law and unprotected under the rule of *Flatley*.

In *Flatley*, our Supreme Court held that "section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." (*Flatley, supra,* 39 Cal.4th at p. 317.) There, an attorney, Mauro, threatened a well-known entertainer, Michael Flatley, to publicly accuse him of rape and other unspecified criminal violations of immigration, tax and social securities laws, and report him to federal authorities if he did not promptly pay an amount of "seven figures" or, "at minimum, $1 million." (*Id*. at pp. 305-311, 329-330.) Flatley did not pay. (*Id*. at p. 311.) Mauro then sued Flatley in Illinois on behalf of the woman who alleged Flatley had raped her, and the two appeared on television describing the alleged rape in lurid detail. (*Id*. at pp. 305-306.) Flatley responded by suing Mauro in California for civil extortion and other torts. (*Id*. at pp. 305-306.) Mauro and his client, who eventually dismissed their Illinois actions against Flatley (*id*. at p. 306, fn. 2), moved to strike Flatley's complaint under the anti-SLAPP statute. (*Flatley,* at p. 306.)

Only after concluding, based on its review of the pleadings, the letter, and declarations submitted by the parties, that Mauro's letter and follow up phone calls reiterating the threats and demanding money constituted "criminal extortion as a matter of law," did the court hold that section 425.16 did not apply. (See *Flatley*, *supra*, 39 Cal.4th at pp. 332-333.) The opinion makes plain that the court's exception to the first step, protected activity requirement in the anti-SLAPP law is narrow. The court held only that "where a defendant brings a motion to strike under section 425.16 based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but *either the defendant concedes, or the evidence conclusively establishes*, that the assertedly protected speech or petition activity was *illegal as a matter of law*, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." (*Id.* at p. 320, italics added.)

The Supreme Court emphasized in *Flatley* and its progeny that a defendant need "only make a prima facie showing that the underlying activity falls within the ambit of the [anti-SLAPP] statute." (*Flatley*, *supra*, 39 Cal.4th at p. 317; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 828 (conc. opn. of Kennard, J.) [defendant "need only show the existence of a legitimate issue" as to conduct's validity].) Indeed, "[i]f . . . a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step [of the anti-SLAPP inquiry] but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Flatley*, at p. 316.) Not surprisingly, then, the courts have consistently held that the *Flatley* exception from the anti-SLAPP statute is narrow. (E.g., *Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 835 (*Flickinger*) ["The *Flatley* court went to great lengths to limit the scope of the

16

crime-as-a-matter-of-law exception to section 425.16 protection"]; *Zucchet v. Galardi* (2014) 229 Cal.App.4th 1466, 1478 ["Our Supreme Court has emphasized that the exception for illegal activity is very narrow and applies only in undisputed cases of illegality. 'If . . . a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits' "]; *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 [Supreme Court's use of the phrase "illegal" was intended to mean criminal, and not merely violative of statute]; *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 424 [legal or factual dispute regarding claim of illegality precludes defeating anti-SLAPP motion at the first step].)

There was no such concession with respect to Osborne's 2019 letter to HAG's HR department. Slap points to his own "*uncontroverted* [deposition] testimony that he was blackmailed[7] by Ms. Osborne on December 10, 2019, when she threatened that if he did not make her an exempt, salaried employee that she would report to higher ups at HAG that Ms. Osborne had been doing Mr. Slap's personal errands on company time." He argues his testimony was "corroborated" by Cassity's testimony "that he reported this blackmail attempt contemporaneously to her." Finally, he contends that Osborne did not "dispute that she blackmailed [him]." Thus, by his reckoning, " '*the evidence conclusively establishes* that the assertedly protected speech or petition activity was illegal as a matter of law.' "

Slap's argument is fundamentally flawed. The premise of his argument is that the conversation he describes in which Osborne threatened to report him to HAG "higher ups" if he "did not make her an exempt, salaried

---

    7  Slap equates the term "blackmail" with the "crime of extortion."

17

employee," ipso facto amounts to the crime of extortion or attempted extortion as a matter of law. His opening brief assumes that is the case without analysis.

Not surprisingly, Osborne disagrees, contending, "Slap's argument that his evidence conclusively established the HR Letter was extortionary is wrong" and the HR letter was a "plainly a legitimate exercise of Osborne's right to complain about illegal conduct: e.g., harassment, retaliation, and her employer's failure to pay her properly." Osborne cites CALCRIM No. 1830, which sets forth the elements of the criminal offense of extortion.

Slap, by contrast, fails to set forth or discuss all the elements of the offense, fails to cite the criminal extortion statutes and explain how they apply to this case, and fails to discuss any of the post-*Flatley* cases addressing the exception it established. (See, e.g., *Flickinger*, *supra*, 85 Cal.App.5th at p. 836 [*Flatley* exception did not apply to defendant's demand letter which "bears no resemblance to the 'extreme' conduct in *Flatley* which warranted a 'narrow' exception" to anti-SLAPP protections]; *Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1028 [if threat to report misappropriation of funds to State Bar was made, it had a reasonable connection to the underlying dispute and therefore was not comparable to the "extreme" conduct found unprotected by *Flatley*]; *Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1288, 1298-1299 [*Flatley* exception did not apply where demand letter, though accusing plaintiff of crimes, made no overt threat to report plaintiff to prosecuting agencies or to the public at large].) He also fails to discuss and thus makes no attempt to draw analogies to the handful of cases applying that narrow exception, such as *Flatley* itself, 39 Cal.4th at pp. 317-318; *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1423 [defendant's email threatening to expose alleged criminal violations by plaintiff, unrelated to

18

any injury allegedly suffered by defendant, to federal authorities]; *Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696, 703 [false police report with subsequent factual finding of plaintiff's innocence]; and *Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2006) 143 Cal.App.4th 1284, 1296 [defendant conceded its acts of vandalism in support of animal rights issues were unlawful].)

Without any such analysis or discussion, Slap's briefs leave nothing but unanswered questions concerning the crime he asserts Osborne committed.[8]

_____

[8] For example, it is not clear whether, and if so how, Slap could claim a completed act of extortion given his concession that Osborne "did not achieve the result she desired." Further, he does not explain how his apparent theory of attempted extortion can be squared with his testimony stating that Osborne's allegedly extortionate threat was made to him in a conversation they had in person. Attempted extortion requires a threat conveyed in writing. (See Pen. Code, § 523.)

Nor does Slap explain how the other elements of extortion apply. Fear, for purposes of extortion, requires a threat of at least one of five specified types of threat. (Pen. Code, § 519; *People v. Umana* (2006) 138 Cal.App.4th 625, 639; see *Malin, supra,* 217 Cal.App.4th at p. 1299 [demand letter not extortion where it did not fall within a § 519 category].) Slap mentions one category in passing, a threat "[t]o expose a secret affecting" the target of the threat or his relative.

However, as Osborne points out, "[l]ogically, one can't blackmail another person by threatening to reveal what is already known," and Slap has asserted that HAG was fully aware that Osborne was performing personal tasks for him and in fact authorized her to do so.

Moreover, to amount to extortion, the threatened exposure must be of a secret that, among other things, " ' "affect[s] the threatened person in some way so far unfavorable to the reputation or to some other interest of the threatened person, that threatened exposure thereof would be likely to induce him through fear to pay out money or property for the purpose of avoiding the exposure." ' " (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 387.) " 'Whether a threatened exposure would have this effect on the victim is a factual question . . . .' " (*Ibid.*)

It was Slap's burden, not the court's, to demonstrate error by presenting authority and argument on this point. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565; Eisenberg, Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2023) (Eisenberg) ¶8:17.1.) Among the most basic principles of appellate review are that a trial court's decision is presumed correct, and the appellant bears the burden of presenting argument and legal authority to demonstrate error thereby overcoming the presumption. (Eisenberg, *supra*, ¶¶8:15, 8:17.1.) Where, as here, the appellant has not done so, " 'the court may treat [the issue] as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793; accord, *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived' "].) These rules apply even where our review is de novo. (Eisenberg, *supra*, ¶8:17.2; *Davies v. Sallie Mae, Inc.* 168 Cal.App.4th 1086, 1096; see *Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 294.)

Even if Slap had not waived his argument that the *Flatley* exception applies, we would reject it. Slap's conclusory assertion that Osborne's statements to him amounted to "blackmail" and "extortion" are nothing but characterizations unsupported by evidence or legal authority. As such, he has fallen far short of making a conclusive showing that Osborne's statements amounted to extortion. (Cf. *Flickinger*, *supra*, 85 Cal.App.5th at p. 837 ["Although plaintiff says he understood it as a threat to go accuse him of a crime, his subjective and self-serving interpretation cannot establish extortion as a matter of law"].)

Nor, contrary to Slap's contention, do Osborne's failures to deny she made the statement he characterizes as a "threat" or to deny his accusation that the statements in the HR letter are "false" amount to a concession that she committed extortion or any other crime. In fact, after Slap accused Osborne of blackmail in his opposition briefing to the motion, she did contest the charge that she acted illegally and that her assertions about doing personal work for him were false, and she has maintained these positions on appeal. (See *Zucchet v. Galardi, supra,* 229 Cal.App.4th at pp. 1479-1480 [no concession where defendant denied illegality in reply briefing and on appeal]; see also *Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th at p. 828 (conc. opn. of Kennard, J.) [defendant "need only show the existence of a legitimate issue" as to conduct's validity"].) The trial court therefore did not "ignore[e]" any "unconverted testimony that [Slap] was blackmailed." (Italics added.)

There is no "uncontested" evidence that supports Slap's claim of extortion, and Slap has failed to show this is "one of those rare cases in which there is uncontroverted and uncontested evidence that establishes the crime [of extortion] as a matter of law." (*Cross v. Cooper, supra,* 197 Cal.App.4th at p. 386.) Because Slap's cross-claims are based on protected speech in furtherance of her right to petition and the illegality of that speech is neither uncontested nor conclusively established, Osborne has satisfied her burden on the first prong of the anti-SLAPP analysis.

### III.

### *As a Matter of Law Slap's Cross-Claims Are Barred by the Litigation Privilege and Thus He Cannot Meet the Second Step Requirement That His Claims Have a Probability of Success.*

As we have noted, once the defendant has established that her claims fall within one or more of the "protected activities" categories under

21

section 475.16, subdivision (e), the burden shifts to the defendant to show a likelihood of prevailing on the merits of his claims. "To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.) "The plaintiff must do so with admissible evidence. [Citation.] 'We decide this step of the analysis "on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff.' " ' " (*Optional Capital, Inc. v. Akin Gump Straus, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 112-113 (*Optional Capital*).) "This second step has been described as a ' "summary-judgment-like procedure." ' [Citation.] A court's second step 'inquiry is limited to whether the [opposing party] has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [The court] . . . evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.' " (*Id.* at p. 113.)

Osborne asserted the litigation privilege was an absolute bar to Slap's complaint, and the trial court agreed. " 'A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes a defendant's liability on the claims.' " (*Optional Capital, supra,* 18 Cal.App.5th at p. 115.) Slap challenges this ruling on appeal.

Preliminarily, Slap argues the trial court erred in finding the letter absolutely privileged because, he contends, in the trial court Osborne argued

only that it was conditionally privileged. Slap fails to develop the argument or cite any authority and thus has waived it. (*Hewlett-Packard Co. v. Oracle Corp.*, *supra,* 65 Cal.App.5th at p. 565.) Even if he had not waived it we would reject it because, in fact, Osborne invoked the litigation privilege in her trial court opening brief, citing Civil Code section 47, subdivision (b) and arguing the HR letter "related to litigation that was being contemplated in good faith." She supported the claim with evidence. Slap responded in his opposition brief, and when he suggested Osborne had conceded in her reply that only the conditional privilege applied, Osborne's counsel explained that was not intended and, if anything, was an error. The trial court allowed both parties to provide supplemental briefing and evidence on the subject and ruled on the matter only after receiving that material. The matter was therefore fully aired in the trial court, and Slap has made no effort to show the trial court abused its discretion in addressing it. (See, e.g., *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 153-154 [trial court has " 'great discretion' " in deciding whether to grant continuance]; *Jack v. Ring* (2023) 91 Cal.App.5th 1186, 1196 [we review for abuse of discretion trial court's decision whether to allow parties to supplement the record and file additional briefing].) Having made no effort to show the trial court abused its discretion by reaching the absolute privilege issue after supplemental briefing was permitted, Slap's argument that the trial court erred in addressing the absolute privilege fails.

Before turning to the parties' arguments on the merits of the litigation privilege, we set forth general principles governing the privilege. Although Civil Code section 47, subdivision (b), which codifies the common law litigation privilege, refers to a "publication or broadcast" made "[i]n any . . . judicial proceeding," our courts have held that communications with " 'some

relation' to an *anticipated* lawsuit" are protected by the litigation privilege. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194.) Citing cases that date back decades, our high court explained, "numerous decisions have applied the privilege to prelitigation communications." (*Ibid*.; accord, *Action Apartment, supra,* 41 Cal.4th at p. 1241 ["The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards' "].) " 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.' " (*Action Apartment, supra,* 41 Cal.4th at p. 1241.) Indeed, the privilege " 'has been referred to as "the backbone to an effective and smoothly operating judicial system." ' " (*Id*. at p. 1248.) To achieve its broad purposes, our courts "have given the litigation privilege a broad interpretation." (*Id*. at p. 1241.)

"To be protected by the litigation privilege, a communication must be 'in furtherance of the objects of the litigation.' [Citation.] This is 'part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action.' " (*Action Apartment, supra,* 41 Cal.4th at p. 1251.) Slap is correct in stating that "[a] prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Ibid*.) " '[W]hen the person publishing an injurious falsehood is not seriously considering litigation," " 'the publication has no "connection or logical relation" to an action and is not made "to achieve the objects" of any litigation [citation]. No public policy supports extending a privilege to persons who attempt to profit from hollow threats of litigation.' " (*Ibid*.)

24

Before addressing the application of the litigation privilege to this case, we address two preliminary matters. First, he discounts Osborne's declaration that she was contemplating litigation in the days before she sent the HR letter as "self-serving" and, in essence, irrelevant because, he contends, the "good faith and under serious consideration" test is "an objective" one. The argument has no merit.

"In ordinary usage, the phrase 'good faith' is commonly understood as referring to a subjective state of mind." (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1120; see also *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 944 [whether person intends to exercise constitutional right to petition government by persuading another to file lawsuit depends on the state of mind of the person offering the persuasion].)

This is just as true in the case of the good faith standard for the litigation privilege as it is in other contexts. *Action Apartment*, which Slap cites, reflects that the standard for whether litigation is "contemplated in good faith and under serious consideration" is a subjective, not an objective, reasonable person test. The court held an ordinance that imposed penalties on landlords who serve eviction notices based on facts they have no reasonable cause to be true or on untenable legal theories was preempted by the litigation privilege to the extent it applied to situations where litigation is contemplated in good faith, which the court observed requires "a factual inquiry." (*Action Apartment, supra,* 41 Cal.4th at p. 1252.) The court's analysis indicates the litigation privilege applies when there is actual and serious *subjective* contemplation of litigation even if that contemplation is objectively unreasonable.

A declaration proffered by a defendant attesting that she was contemplating litigation at the time of the writing is particularly probative of

25

her actual state of mind regarding contemplation of litigation. Of course, a court is not bound by such a declaration and must consider other relevant evidence, including circumstantial evidence, bearing on the defendant's state of mind, and such evidence might corroborate or might undermine the defendant's sworn statement. But to bar consideration of the testimony of the only person with direct knowledge of the subject would require courts to ignore what in many instances will be the only direct evidence of the defendant's good faith.[9]

Second, Osborne argues the HR letter is protected "because it was necessary to address a commonly used affirmative defense by employers in sexual harassment cases," citing *Comstock, supra,* 212 Cal.App.4th 931. In *Comstock*, we held an employee's complaints to her employer's HR manager that her supervisor and another employee sexually assaulted her were protected as "statements prior to litigation or other official proceedings" under section 425.16, subdivision (e)(1) and (2) of the anti-SLAPP statute.

---

[9] Slap cites *Anapol, supra,* 211 Cal.App.4th 809 for the proposition that "[i]t has long been established that the court should not look at a person's intent or subjective belief, even in a declaration." The opinion does not support that proposition. There, an insurance company sued two attorneys alleging they participated in a "massive insurance fraud ring" by submitting fraudulent claims for damage from wildfires. (*Id*. at p. 814.) The attorneys contended the claims they had submitted were protected by the litigation privilege. One of the attorneys submitted two declarations about his anticipation of litigation at the time he submitted the claims, one declaration contradicting the other. The court held the second declaration could not constitute prima facie evidence supporting application of the privilege. (*Id*. at p. 828.) The other attorney declared that when he submitted the claims, he believed litigation would be necessary. (*Id*. at p. 829.) But there was no evidence the attorney had expressed this belief to his clients, the insureds, and no evidence the clients anticipated litigation at the time. For those reasons, there was no prima facie showing the claims were privileged. (*Id*. at p. 830.) The court did not refuse to consider the declarations of either attorney. It simply held they did not, under the circumstances, suffice.

(*Comstock,* at pp. 944-945.)  We so held based on the defendant's theory that her "statements were necessary to address a commonly used affirmative defense by an employer in a sexual harassment case—a defense, not incidentally, that [the employer had] in fact asserted" against her in response to her suit against him and the company.  (*Id.* at p. 944.)  The defense was "that the employee unreasonably failed to take advantage of preventative or corrective opportunities provided by the employer."  (*Ibid.*; *id.* at pp. 934-935.)

Osborne contends that here, as in *Comstock*, the HR letter was "necessary to address a commonly used affirmative defense by employers in sexual harassment cases."  With her anti-SLAPP motion in the trial court, she proffered excerpts of HAG's and Slap's answers to the complaint.  Both included as an affirmative defense, the allegation that Osborne's claims are barred because she "unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendants to avoid any harm."

In *Comstock*, as we have indicated, we applied provisions of the anti-SLAPP statute.  We went on to discuss, under step two of the anti-SLAPP analysis, whether Comstock had demonstrated a likelihood of prevailing on the merits of his claims and concluded he had not.  (See *Comstock, supra,* 212 Cal.App.4th at pp. 947-955.)  However, we so held in part because of Comstock's failure to submit any admissible evidence supporting one of his claims.  (*Id.* at p. 952.)  In addressing his other claims, we held they were privileged, but under the Civil Code section 47, subdivision (b)(2) privilege for statements in official proceedings and under the section 47, subdivision (c) privilege for communications with interested parties.  (See *Comstock,* at pp. 952-953.)  In *Comstock*, we did not have occasion to discuss the litigation privilege.  The *Comstock* holding that the alleged communication to the HR

27

department was privileged because it was necessary to respond to an anticipated affirmative defense supports Osborne's assertion of the litigation privilege. However, *Comstock* does not definitively hold that fact alone would suffice to establish the litigation privilege (as opposed to protected activity within the meaning of the anti-SLAPP statute), and the parties have neither discussed nor provided authority on the subject.[10] What we can say with confidence is that the fact that the HR letter was necessary to respond to the potential affirmative defense that defendants eventually raised in the case Osborne filed satisfies the litigation privilege requirement that the communication be in furtherance of the litigation, that is, that it "function as a necessary or useful step in the litigation process and must serve its purposes." (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1146; see *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219-220.)

We therefore turn to the application of the standards governing the litigation privilege to the evidence in this case and, as we shall explain, conclude the undisputed evidence establishes that the HR letter was sent in anticipation of litigation and is protected by the litigation privilege as a

---

[10] In the anti-SLAPP context, we note that some courts have held a communication that is a "necessary prerequisite to litigation" is not a protected activity under the anti-SLAPP statute if litigation is not actually anticipated and is only a possibility. (E.g., *Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 703; *Bel Air Internet, LLC v. Morales, supra,* 20 Cal.App.5th at p. 941.) Our decision in *Comstock*, in which litigation was initiated within two months of the alleged sexual assault and the statements the plaintiff allegedly made about it, is not in tension with *Mission Beverage* and *Bel Air*, but again, neither those cases nor our decision in *Comstock* specifically address the litigation privilege. (See *Comstock, supra*, 212 Cal.App.4th at pp. 934-937.)

matter of law.[11] The evidence establishes the following facts, none of which Slap disputes.

While working at HAG as Slap's personal secretary, Osborne performed both personal and business-related tasks for Slap.[12] Osborne complained to HAG that she was not being compensated for all the time she spent performing personal tasks for Slap and that HAG had declined her request to become a salaried rather than hourly employee. (Slap denies the truth of this and other accusations asserted in Osborne's HR letter but does not deny she made the claims.) For purposes of the litigation privilege, whether Osborne's claims in the HR letter are true or false or were made with malice is irrelevant. (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 955-956 [the privilege applies even if the statement was false and made with malice].)

On December 20, 2019, about four years after she was hired as Slap's executive assistant, Osborne sent the HR letter to Cassity with a cover email, the subject line of which was "**Formal Complaint,**" and the body of which stated, "Hi Nancy. Per your direction last week I have put my complaint in writing. Please see attached." The letter referred to a discussion between Osborne and Cassity on December 10, 2019, about "some of my concerns

---

[11] There is a split of authority as to who bears the burden of proving the affirmative defense of privilege where it is raised as a defense to the plaintiff's ability to show a likelihood of prevailing on the merits at the second step of the anti-SLAPP analysis. (*Bentley Reserve L.P. v. Papaliolios* (2013) 218 Cal.App.4th 418, 434, fn. 7 [noting split].) We need not weigh in on the issue because, even assuming the burden is on the defendant, the undisputed facts plainly establish the HR letter is protected by the litigation privilege.

[12] Slap admits he asked Osborne to perform some personal tasks, and contends that such tasks were "included in her job duties," "part of her job description" and "authorized" by HAG. He also says she "volunteered" or "offered" to do some of the tasks.

about my working relationship with Mr. Slap," in which Cassity told her "I would need to put these in writing before any action could be taken or my concerns could be addressed." The letter stated, "Accordingly, I am sending you this letter in a final effort to have my concerns acknowledged, addressed and resolved."

The letter stated that "[a]lthough we have discussed some of these concerns on numerous occasions, and hoped that Mr. Slap's behavior would improve, I now find the work conditions unbearable and intolerable." It asserted that she "remain[ed] very concerned about retaliation by Mr. Slap and the Company." It requested "a prompt, fair and thorough investigation of my complaint, and protection from retaliation."

The letter described Slap's conduct as "inappropriate, harassing and retaliatory," "hostile," "humiliating" and "abus[ive]." In more than four pages of single-spaced text, it went on to provide many examples of allegedly inappropriate, harassing, retaliatory and abusive conduct. For example, it accused Slap of asking Osborne to work while she was on maternity leave and offering to pay her on the side after he had been advised by HAG's controller not to have her work during her leave. When she was eight months pregnant, he asked her to continue to purchase and carry multi-gallon water jugs against her doctor's advice. It described increasing demands Slap made "that were personal in nature" that made her feel "degraded, humiliated publicly, and often abused," such as being asked to cut his food, to come to his office to pour him water from a pitcher, to remove his "drenched gym clothes" from his bag and take them home to wash, to burn a wart off his foot and to drive him to the emergency room and remain with him while he was in a hospital gown answering personal questions while "rolling around moaning in pain."

30

The letter reported that Osborne had complained to Slap about another employee who "had been sexually harassing [her] since [her] return from maternity leave." The letter claimed Slap "did nothing" in response to her complaints that the employee was following her and physically touching her, and that instead of reporting the employee Slap had promoted him. Later, after the employee sued the company, Slap told her if she were deposed, she should be sure to mention the sexual harassment but not to say she had told Slap about it.

The letter also accused Slap of asking Osborne to perform personal tasks for him but not allowing her to "log hours" for that work, said he had "become aggressive" and "hostil[e] towards her when she asked to be paid and accused him of repeatedly failing to pay her for hours she worked. It asserted that Slap had promised her a raise but told her it would be "between us" and would not be in writing, and he failed to honor the promise until directed by HR to do so. The letter stated Osborne had complained to Cassity "months ago" about not being paid "and again last week when this became an issue again." She said that Slap had "specifically instructed [her] to **not** contact you or HR" and instructed her "to **not** ask for HR help."

The letter closed by requesting that the company "immediately" stop Slap's "harassment and abuse of [her]," "formalize" her salary and monthly increase "so that I do not have to beg and argue for it every month" and pay her "for all of [her] work." Slap denied many of Osborne's assertions in the letter but admitted she sent it.

By the time Osborne sent the HR letter, she had already had "multiple communications" with Cassity about the subject matter of her "December 20 complaint" (the HR letter), including not getting paid for work she was doing for Slap. One conversation in December 2019 took place when Osborne

31

reached out to Cassity right after she and Slap had "an altercation" in which he had "thrown my pay increases at me in a folder." This caused her to feel "insulted" and "offended" and she was "very upset." Osborne asked Cassity to meet with her and Slap together, which was "the only way" there "could be any resolution." In that or another conversation, Cassity told Osborne she would not "keep partipating in this with the two of you" and was "not doing anything about anything," unless Osborne or Slap "put[] it in writing." She said, "[i]f you want help, put it in writing." Osborne "wanted Nancy Cassity to do the job" she had been hired to do "instead of falling in line behind [Slap] and contributing to the corruption that was occurring from the ground up."

Osborne submitted a declaration attesting she had "been contemplating litigation in the days leading up to December 20, 2019, because of the mistreatment I was experiencing working for Defendants." Other evidence corroborates that assertion. For example, a copy of an email sent to Osborne on the day she sent the HR letter. The email was from an assistant for attorney Tyler Paetkau of the Procopio law firm, addressed to Osborne, with an engagement letter and a request for a retainer of $1,000. Osborne attested that she "formally retained" Paetkau on December 27, 2019. Further, Osborne submitted a declaration executed by Paetkau, an attorney licensed in California, stating he was "[Osborne's] attorney of record" "commencing in mid-December 2019 through approximately early February 2020."

Paetkau also attached emails he exchanged with HAG's counsel, Jason Geller, in January 2020. In the first email, Paetkau inquired about the status of the company's investigation of "Eva's complaint," the "results of the Company's investigation and the Company's remedial actions taken, if any" and said Osborne was "ready to return to work." The bulk of the email (three

32

and one-half of four pages) consisted of a "Demand for Employment-Related Documents Under the California Labor Code" and a "Notice of Preservation of Evidence," commonly known as a "litigation hold." When Geller responded with a short email stating Osborne had "submitted a detailed written complaint about Mr. Slap's alleged conduct to which my client has already responded," Paektau sent another email expressing surprise at Geller's statement that HAG had "completed its investigation," and asked, "What remedial action did your client take?" and, "Did your client implement procedures and policies to ensure that Eva can return to work free from further harassment . . . ?" and "What has the company done to stop [Slap's] harassment and abuse of Eva?"

Besides the fact that she hired an attorney in December 2019, who then sent a litigation hold letter to defendants' counsel in January 2020, on March 2, 2020, and March 10, 2020, Osborne filed charges of harassment and retaliation against HAG and Slap with the DFEH, and on March 16, 2020, she filed this lawsuit for civil damages against them based on allegations largely mirror those contained in her December 20, 2019 "complaint" to HAG. The fact that she filed the DFEH complaint and this lawsuit less than three months after sending the HR letter further supports her assertion that she was contemplating litigation when she sent the letter.

Slap contends this considerable and undisputed evidence falls short. He relies on our decision in *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15 (*Centex*) which sets forth four "considerations for distinguishing the point at which the litigation privilege may attach to statements in advance of litigation." (*Id.* at pp. 34-35.) In particular, he claims Osborne's December 2019 letter did not expressly "suggest or propose a 'lawsuit' " (italics omitted) and that her deposition testimony and the letter

33

show it "was a response to a request from HAG's HR department as opposed to litigation." Osborne argues that the *Centex* factors were met in this case. Osborne has the better argument.

Slap's second argument is easily disposed of. There is evidence that Cassity told Osborne the company would not address her concerns if she did not put them in writing, which apparently prompted her to do so. But that in no way indicates that when she wrote the letter she did not have the intention of pursuing litigation if, as had been the case already for some time, HAG still did not remedy the situation.

Slap's first argument, that the letter's failure specifically to threaten or refer to litigation by name means it does not meet the first *Centex* criterion, merits discussion. The letter does not use the word "lawsuit" or expressly threaten litigation. But as we stated in *Centex*, the purpose of these considerations is to "detect at what point on the continuum between the onset of a dispute and the filing of a lawsuit [where] the threat of litigation has advanced from mere possibility or subjective anticipation to contemplated reality." (*Centex*, *supra*, 53 Cal.App.4th at pp. 34-35.) For this purpose, "[i]t is not necessary that a party make an actual 'threat' of litigation"; it suffices if there is "some actual verbalization of the danger that a given controversy may turn into a lawsuit." (*Id*. at pp. 35, 34.)

As Osborne points out, the HR letter, which again Osborne refers to as a "formal complaint," satisfies *Centex*. It alleges many examples of Slap's actionable misconduct, which it characterizes as "harassment," "retaliation" and "abuse." She describes Slap asking her to do personal tasks that made her feel "degraded, humiliated publicly, and often abused" and becoming "hostile" and "aggressive" with her when she asked to be paid for her work. It accuses him of ignoring a complaint she made that another employee was

34

sexually harassing her and of dissuading her from reporting that and or raising other issues with HR. It claims Slap repeatedly failed to pay her for time she worked and prevented her from logging time she spent working at his request. It refers to "numerous" prior conversations she had with Cassity in which she complained and to the company's failure to improve Slap's behavior or her working conditions. It conveys a sense of desperation and imminence, referring to conditions at work having become "*intolerable*" and "*unbearable*" and states she is sending the letter "in a *final effort*" to have Osborne's concerns "acknowledged, addressed *and resolved*." (Italics added.) It demands that Slap's "harassment and abuse of me . . . stop immediately." The "formal complaint" to HR implies a threat of litigation.

This case is unlike *Centex*, which addressed whether the litigation privilege applied to a builder's and insurer's communications in response to homeowners' initial reports of damage to their foundations. (*Centex*, *supra*, 53 Cal.App.4th at p. 22.) Those initial insurance claims led to investigation and repairs by defendants, and many years passed before the repairs eventually failed, the homeowners discovered the design defects that led to the cracking and filed litigation against the builder and insurer for fraud. (*Id*. at pp. 22-25 [cracking reported to defendants in 1986-1987, inspections carried out in 1987-1988, repairs completed in 1988-1989, plaintiffs discovered new cracking and underlying design problems and filed suit in 1993 and 1994].) The court reversed a trial court's decision to apply the litigation privilege to the initial claims of damage and the defendants' responses because the plaintiffs could not show they intended to sue defendants when those communications occurred. (*Id*. at pp. 38-40, 42.)

This case is a far cry from *Centex*. Here, by the time she sent the HR letter, Osborne was plainly upset and frustrated by HAG's failure to address

her ongoing complaints of misconduct and nonpayment regarding Slap.  She did not attempt to "negotiate" a resolution; rather, she submitted  a "formal complaint," referenced the  "numerous" prior communications she had with Cassity about these matters and the failure to effect any change and said the letter was her "final effort" to resolve those matters.  She demanded "immediate" action.  She didn't say "or else I sue," but it was strongly implied.  Moreover, Osborne quickly retained counsel, who sent a litigation hold, and she filed litigation three *months*, not six or seven *years*, after sending the letter.  By the time she sent the letter, "litigation [was] no longer a mere possibility, but ha[d] instead ripened into a *proposed proceeding* that [was] actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute." (*Centex, supra,* at 53 Cal.App.4th p. 39.)

Slap's reliance on *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456 is likewise misplaced.  There, a homeowner, who was also an attorney, sued his homeowners' association after it denied approval of his architectural plans. (*Id*. at p. 1465; see also *id*. at p. 1461.)  He asserted a claim for libel based on a letter the association's attorney sent him accusing him of ethical misconduct.  The appellate court held the allegedly libelous letter was not protected by litigation privilege.  It reasoned that when the letter was written (a year before the suit was filed (see *id*. at pp. 1463-1465)), "litigation had not been seriously considered, the dispute had not ripened into a proposed proceeding, and the parties were not negotiating under the actual threat of litigation." (*Id*. at p. 1473.)  Although in earlier correspondence *the homeowner* had "obliquely" referred to litigation, the allegedly libelous letter from the association's attorney did not, and after he sent it the two had

36

"continued to trade sharply worded correspondence for the next several months" before the plaintiff filed suit. (*Id*. at pp. 1473, 1464.)

The facts in *Ruiz*, involving two attorneys exchanging sharply-worded correspondence over a year before any litigation was filed, bear no resemblance to those here. Osborne, who was not an attorney, had sought legal counsel before she sent the letter to HR. The letter was the culmination of a series of prior oral complaints she had made about illegal harassment, retaliation and other serious workplace misconduct. It stated her work environment had become "intolerable" and that the letter was her "final effort" to resolve her complaints. Within three months of sending the letter, she filed her civil suit, and prior to that, a complaint with the DFEH.[13]

Finally, Slap argues there is no evidence that Osborne contemplated that litigation was "imminent," a term used in *Centex* to distinguish between "a 'bare possibility' " of litigation from litigation that meets the "Restatement requirement that litigation be 'seriously considered.' " (*Centex, supra,* 53 Cal.App.4th at p. 35.) As we have discussed, Slap contends that Osborne's declaration cannot be considered, a contention we have rejected. He also asserts her retention of counsel a week after she sent the HR letter does not show an intention to litigate "imminently" because she does not specifically state the purpose for which she retained him, and that the litigation hold letter her attorney sent to HAG's counsel was sent to try to resolve the

---

[13] In the third case Slap relies on, *Cruey v. Gannett Co.*, *supra,* 64 Cal.App.4th 356, the court discussed the privileges for statements in "an official proceeding authorized by law" under Civil Code section 47, subdivision (b)(3) (*Cruey,* at p. 368) and the conditional privilege for communications among interested parties under section 47, subdivision (c). (*Cruey,* at p. 369.) The employee did not raise the litigation privilege (see *id.* at p. 367), and the court did not discuss it except in passing. (*Id*. at pp. 368-369.)

matter informally rather than as a threat of litigation, as evidenced by its mention of her readiness to return to work and the fact that it was not sent until a month after she sent the HR letter. Last, he contends "[t]he fact that Ms. Osborne later sued is not evidence she was contemplating litigation at the time she sent the December 20, 2019 letter."

None of these arguments undermines Osborne's showing that when she sent the letter, she was contemplating litigation. She had no need to state why she hired counsel because counsel's correspondence makes it plain. His first letter to HAG's general counsel was in large part a litigation hold, reflecting, rather than detracting from, her showing that she anticipated filing litigation imminently. Nor does the reference to her readiness to return to work make the letter an attempt to resolve the matter informally and *not* to communicate that litigation was imminent, as Slap suggests. On the contrary, the statement was immediately followed with an inquiry as to the status of HAG's investigation (as to which Paetkau expressed skepticism because Osborne had not heard from any investigator), a reiteration of Osborne's request for "a prompt, fair and thorough investigation of [her] complaint," a reference to "Slap's inappropriate, harassing and retaliatory conduct" and the statement that Osborne "would like to know, as soon as possible, the results of the Company's investigation and the Company's remedial actions taken, if any." Following that first paragraph, what follows is three and one-half pages demanding documents and preservation of evidence, in other words, a litigation hold. Far from an opening effort to negotiate, counsel's communication was consistent with Osborne's HR letter reflecting that efforts to get HAG to address the problems had been ongoing for a substantial period of time with no resolution, the situation had become "intolerable," and the letter had been her "final" effort to resolve them. That

a demand letter or other communication, after lengthy efforts to resolve a dispute have failed, mentions the possibility of informal resolution does not negate evidence that imminent litigation is genuinely anticipated.

Nor do we agree with Slap that Osborne's filing suit within three months of having sent the letter is not evidence that she anticipated "imminent" litigation at the time she sent the HR letter. Certainly, filing litigation within three months is some evidence of that, albeit by no means the only such evidence in this case. (Cf. *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1269 [anticipated litigation was sufficiently imminent when it was filed within four months after communication]; *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 268 [*Centex* "does not hold or suggest that a complaint must be drafted before the privilege will apply. In short, the question in [*Centex*] was not 'imminentness,' but remoteness"].)

Because the undisputed evidence demonstrates that the HR letter was protected by the litigation privilege as a matter of law, Slap cannot prevail on the merits of his tort claims against Osborne based on statements made in that letter. Because this prevents Slap from meeting the second step of the anti-SLAPP analysis, we need not address the parties' additional arguments about the conditional privilege, malice and whether Slap's allegations are sufficient to establish the elements of his claims.

## DISPOSITION

The order is affirmed. Osborne is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

39

_____

STEWART, P.J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*Osborne v. Slap* (A167118)

Trial Court: Alameda County Superior Court

Trial Judge:  Hon. Eumi Lee

Counsel:

de la Peña & Holiday, Gregory R. de la Peña, Thomas J. O'Brien and Kevin N. LaBarbera, for Defendant and Appellant.

Kochan & Stephenson, Deborah Kochan and Mathew Stephenson, for Plaintiff and Respondent.